IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SARIAH MOODY, ) <br> GRACE READING, ) <br> And ) <br> EMILY CADY, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> CITY OF KANSAS CITY, MISSOURI, ) <br>   ) <br> Defendant. ) | Case No. 20-CV-526 |

## COMPLAINT

1. While participating in non-violent protests in Kansas City, Missouri, in May and June of 2020, focused on issues of police brutality and racial injustice following the murder of George Floyd, Plaintiffs were arrested and charged with violating Kansas City Code §§ 50-44(a) and/or 70-73 (collectively the "Failure-to-Obey Ordinances"), which criminalize the impedance of traffic and the failure to obey an order of a police officer without providing an allowance for expressive activity on a street or sidewalk under any circumstances.

2. Plaintiffs fear participating in future protests because of the police department's enforcement of the Failure-to-Obey Ordinances.

3. In this civil-rights action, Plaintiffs seek injunctive relief against the City of Kansas City, enjoining Kansas City from enforcing the Failure-to-Obey Ordinances because they are facially unconstitutional and as applied to Plaintiffs engaged in expressive conduct, in that they give individual police officers unfettered discretion to engage in arbitrary and discriminatory enforcement. The Failure-to-Obey Ordinances are overbroad and vague under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

1

## PARTIES

4. Plaintiff Sariah Moody is a citizen of Missouri who resides in Cass County.

5. Plaintiff Grace Reading is a citizen of Missouri who resides in Clay County.

6. Plaintiff Emily Cady is a citizen of Kansas who resides in Douglas County, Kansas.

7. The City of Kansas City, Missouri, is a municipal corporation and political subdivision of the State of Missouri.

## JURISDICTION AND VENUE

8. Plaintiffs bring this claim pursuant to the Free Speech Clause of the First Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983.

9. This Court has jurisdiction under 28 U.S.C. § 1331 as this claim "arises under the Constitution of the United States."

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendant is located in the City of Kansas City, Missouri, and its actions giving rise to the claims in this suit occurred in the City of Kansas City, Missouri.

11. Venue is proper in the Western Division of this Court pursuant to W.D. Mo. Local Rule 3.2(a)(1)(A).

## FACTS

### The Challenged Ordinances

12. The Failure-to-Obey Ordinances specify substantive limits on conduct.

13. Kansas City Code § 50-44(a) states: "Any person who shall in any way or manner hinder, obstruct, molest, resist or otherwise interfere with any city public safety officer,

employee or inspector, including, but not limited to, any firefighter or other fire suppression employee, fire prevention inspector, health inspector, building code inspector, zoning inspector, property maintenance or nuisances code inspector, illegal dumping inspector, regulated industries investigator or animal control officer, any employee or official of the metropolitan ambulance services trust or the ambulance contractor providing ambulance service for the metropolitan ambulance services trust, or any officer of the city police department or any member of any other law enforcement agency or police force, in the discharge of his/her official duties shall be guilty of an ordinance violation."

14. Kansas City Code § 70-73 states: "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer, parking control officer, firefighter or uniformed adult school crossing guard with authority to direct, control or regulate traffic."

15. Kansas City Code § 50-44(a) does not include an intent requirement.

16. Specifically, to violate Kansas City Code § 50-44(a), a person does not need to have a specific intent to "hinder, obstruct, molest, resist or otherwise interfere with a city public safety officer."

17. In contrast, Kansas City Code § 70-73 includes an intent requirement. Namely, the provision is triggered if a person "<u>willfully</u> fails or refuses to comply with any lawful order or direction of any police officer." (emphasis added).

### The Plaintiffs

*Plaintiff Sariah Moody*

18. Sariah Moody attended non-violent protests with her daughter at the Plaza in Kansas City on May 30 and 31, 2020.

19. Ms. Moody estimates that there were approximately 2000 protesters on the Plaza that day.

20. On May 31, 2020, beginning around 2:00 PM, Ms. Moody began sitting on J.C. Nichols Parkway with approximately six other people on the street just off the curb, west of the J.C. Nichols Memorial Fountain.

21. Ms. Moody has some health issues that make it difficult for her to stand for long periods of time.

22. She was trying to keep her distance from the main crowd to avoid contracting the virus that causes COVID-19.

23. Ms. Moody was sitting, or occasionally kneeling, very close to the curb on J.C. Nichols Parkway near the crosswalk of J.C. Nichols Parkway at Emanuel Cleaver II Boulevard.

24. While she was sitting and kneeling, Ms. Moody had brought bubbles and a bubble wand, and she was blowing bubbles as part of her protest.

25. J.C. Nichols Parkway was closed to vehicle traffic. During the afternoon on May 31st, police officers had moved some protesters from 47th Street, but had said that Ms. Moody was ok to be in the street near the curb at J.C. Nichols Parkway.

26. A little after 5:00 PM, suddenly, Ms. Moody's daughter told her to "watch out."

27. Ms. Moody looked up, but because the sun was in her eyes, she could see only shadowy figures advancing towards her.

28. Ms. Moody does not know whether the shadowy figures were police officers or SWAT officers, but the officers were shouting "move, move!"

29. Ms. Moody heard no warning from the police, nor was she told to move prior to being shouted at by the figures moving toward her suddenly.

30. Ms. Moody was still seated on the ground, when two officers picked her up off the ground, and she was then surrounded by six other officers.

31. The officers asked her if she was going to move, and she said, "No."

32. Ms. Moody did not move because that entire area – including J.C. Nichols Parkway and the location where she had been sitting – was shut down for the purpose of the protest to vehicle traffic.

33. Other protesters were also being arrested, and many of the protesters – including Ms. Moody – asked the reason for their arrests. The officers never responded.

34. Ms. Moody had not moved from her location the entire time she was protesting, but she was one of the first persons arrested. A map of the area is included below for visual assistance.



35. Ms. Moody's hands were zip-tied so tightly that they became numb. She did not recover full feeling back in her hands until the next day, and she missed work due to the injury.

36. After Ms. Moody's arrest, she was taken by the police to two different precincts and placed in a cell at both locations.

37. Despite Ms. Moody's requests, the police officers refused to tell her what she was being charged with.

38. It was not until after Ms. Moody spoke with a bail bondsman that she learned she was charged with a violation of section 70-73 for failure to comply with the police.

39. Her bond was set at $1,000.

40. On her bond release document, an officer wrote that Ms. Moody was "not to return to Plaza."

41. Ms. Moody believes strongly in the cause of the protests – raising awareness about police brutality and racial injustice – and these were the first protests she had ever attended. But, because of her arrest, charges, and treatment by police, she is now fearful to exercise her right to protest, and she does not believe she will participate in future protests unless she is accompanied by legal counsel.

<em>Plaintiff Grace Reading</em>

42. Grace Reading and a friend raised money to provide supplies to the protesters.

43. On June 2, 2020, Ms. Reading and her friend arrived at the Plaza to distribute those supplies, which included water bottles, first aid supplies, goggles, wipes, rubbing alcohol, gauze, and masks.

44. When she arrived at the Plaza around 5:30 PM, the protesters were west of the J.C. Nichols Fountain, lined up on J.C. Nichols Parkway, which had been closed to traffic.

45. Ms. Reading estimates that as many as 50 or more police officers were standing on the sidewalk west side of J.C. Nichols Parkway, in front of the Rye Plaza restaurant, immediately north of P.F. Chang's.

46. When Ms. Reading arrived, the police officers were grouped together while observing the protesters from their position in front of Rye Plaza.

47. The protesters were on the east side of J.C. Nichols Parkway and (with limited exceptions) did not cross the double yellow lines in the middle of J.C. Nichols Parkway, which the protesters treated as an informal divider between themselves and the nearby police officers. A map of the area is included below for visual assistance.



48. After Ms. Reading dispersed supplies, she returned to join the protesters on J.C. Nichols Parkway.

7

49. When she returned, the police had changed their position. Instead of observing the protesters, the approximately 50 officers were now lined up in rows in front of Rye Plaza on J.C. Nichols Parkway and appeared ready to take immediate action against the protesters.

50. Ms. Reading was standing with other protesters at the yellow painted traffic line on the closed J.C. Nichols Parkway, which the police officers had previously allowed protesters to do.

51. Without any warning, the police officers began to order the protesters to "step back."

52. An African-American protester standing next to Ms. Reading (who is white) encouraged Ms. Reading not to step back.

53. Ms. Reading and her friend decided to stand with this and other protesters, and refused to move out of the street.

54. As the police approached, Ms. Reading locked arms with her friend.

55. The advancing police officers arrested Ms. Reading and her friend.

56. Once arrested, Ms. Reading was taken to the patio at the Cheesecake Factory on the southwest corner of 47th Street and J.C. Nichols Parkway where her bag was searched. She not given *Miranda* warnings.

57. While she did not have a mask, the police required her to remain within six feet of other people, and she was unable to safely social distance herself from them which caused her concern due to the COVID-19 pandemic and the known community spread of the virus that causes COVID-19.

58. After her arrest, Ms. Reading was driven around by the police for approximately 30 minutes before she was taken to a parking lot and then to a precinct, where she was booked.

8

CORE/3520307.0002/160173323.2

Case 4:20-cv-00526-HFS   Document 1   Filed 06/30/20   Page 8 of 18

59. It felt more like a kidnapping to Ms. Reading than an arrest.

60. Ms. Reading asked what she was being charged with, but the police officers would not tell her anything.

61. At the precinct, Ms. Reading saw officers using excessive physical force on other arrested protesters.

62. One police officer tackled an African-American female protester, slammed her into the concrete ground, and placed his knee on the same protester's neck.

63. The same protester was later taken away by ambulance.

64. Ms. Reading was released on a $500 bond after approximately five hours in custody.

65. Ms. Reading was charged with violating section 50-44(a).

66. Ms. Reading has attended several non-violent protests in the past, including at least three other non-violent protests in Kansas City where she was not arrested and did not witness any arrests. The other protests focused on issues such as abortion rights, humane treatment of immigrants, and the #MeToo movement. Police presence and actions at the recent protests against police brutality and racial injustice were markedly different from the protests Ms. Reading has attended in the past.

67. Because of her arrest and the treatment she received by the police during the non-violent protests on June 2, 2020, Ms. Reading feels anxious at the thought of attending another protest in Kansas City and has not attended one since her arrest, despite being asked by friends to join them at subsequent protests. She experiences a new wave of anxiety now when a police car passes her while she is driving. Until she feels safe returning to in-person protests of police brutality and racial injustice, Ms. Reading has shifted her focus to letter writing and email

9

CORE/3520307.0002/160173323.2

Case 4:20-cv-00526-HFS   Document 1   Filed 06/30/20   Page 9 of 18

campaigns. The treatment she received by the police on June 2, 2020, was dehumanizing and disorienting. Watching the officers assault an African-American protester right in front of her and their actions taunting her and others while they sat in a jail cell are experiences that will replay in her mind for the rest of her life.

68. Ms. Reading believes that protests will continue until Kansas City begins to act in the interest of its residents, which may take months or even longer.

*Plaintiff Emily Cady*

69. Plaintiff Emily Cady attended non-violent protests at the Plaza in Kansas City on June 1, 2020.

70. Around 5:30 PM, Ms. Cady and a friend joined a group of non-violent protesters who were marching north from 47th Street along Main Street towards downtown Kansas City.

71. The group was led by a minister who stopped at times to kneel and to encourage the group to continue to protest non-violently.

72. Police officers remained along the sides of the group as they marched north on Main Street, and at many of the side streets, several officers blocked movement east or west.

73. Eventually the group reached 31st and Main. Here, the police officers blocked further movement north.

74. The group held a consensus vote and decided to continue to move toward downtown Kansas City.

75. To avoid the blockade at 31st and Main, the group backed up to the south on Main and then headed west on Linwood Boulevard toward Broadway.

76. When the group reached Broadway, they turned north again.

77. At 31st Street and Broadway, Ms. Cady and the group observed another blockade formed by approximately 70 police officers and their vehicles blocking further movement north.

78. The protesters stopped a full block before they reached the police barricade.

79. Around 7:30 PM, Ms. Cady observed police officers putting on riot gear.

80. Some of the protesters returned to the Plaza, but many, including Ms. Cady, remained and knelt down.

81. As protesters were kneeling, one officer commanded the police in riot gear to "commence forward march," and the officers began advancing toward the protesters in a line while hitting their batons on their shields.

82. A police officer on a megaphone told the protesters that it was an unlawful gathering and ordered the protesters to return south.

83. The officer on the megaphone told the protesters that they could not have access to the highway (presumably the continuation of Broadway to the ramp onto Interstate 35).

84. Multiple protesters responded that they did not intend to go to the highway but only wanted to move forward (north on Broadway).

85. The police officers continued to advance toward the protesters, and the remaining protesters, including Ms. Cady, moved toward the Plaza, now heading south along Pennsylvania Avenue.

86. The police had set up another blockade at or around 39th Street and Pennsylvania, blocking the remaining protesters from heading further south, which they had been just previously ordered to do by the officer on the megaphone.

87. The group crossed 39th Street, stepped onto the sidewalk on the south side of 39th Street, and headed east on 39th Street toward Washington Street.

88. Before they reached Washington Street, Ms. Cady and the other protesters, who were on the sidewalk, were suddenly surrounded by shouting police officers.



89. Police officers ordered all the protesters to get on the ground.

90. Ms. Cady, who was standing on the sidewalk, initially said "no," and one officer screamed at Ms. Cady to "get on the fucking ground."

91. Some of the protesters asked why they were under arrest but did not receive specific answers.

92. Ms. Cady heard the police officers say to each other "What's the arrest?" and "What are we noting?"

93. Ms. Cady's backpack was searched without her consent.

94. She was then put in a vehicle with four other protesters and taken to a parking lot where she and the others were booked into custody.

95. Ms. Cady was released on a $1,000 bail at approximately 5:00 AM on June 2, 2020.

96. She was charged with a violation of section 70-73 for failing to comply with the lawful order of a police officer.

97. When she was signing the bail paperwork, a police officer said to Ms. Cady, "If you get arrested for the same offense, you won't be eligible for bail."

98. Ms. Cady has attended other non-violent protests in the past, including the Women's March, a non-violent protest in Kansas City where she was not arrested and did not witness any arrests. However, because of her arrest and the treatment she received by the police during the non-violent protests on June 1, 2020, Ms. Cady is afraid to return to protests in the future. She is afraid of being arrested, tear gassed, hit with a baton, or injured by police while participating in non-violent protests. She is especially concerned about being arrested and held without bail or being detained for a long period of time.

*General Allegations*

99. Protests focused on police brutality and racial injustice are ongoing in Kansas City and are expected to continue through at least October 2020.

100. Between May 29, 2020, and June 3, 2020, over 220 protesters were cited for violating the Failure-to-Obey ordinances.

**COUNT I: FIRST AMENDMENT**
*The Failure-to-Obey Ordinances Are Overbroad in Violation of the First Amendment*

101. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

102. Plaintiffs engaged in constitutionally protected expressive activity when they gathered with other protesters on public streets and sidewalks, and when they marched as a group, to express their support to ending police brutality and racial injustice in Kansas City.

103. Plaintiffs have been chilled from engaging in constitutionally protected speech because of their reasonable fears associated with citation, arrest, and/or prosecution.

104. Fear of citation, arrest, and/or prosecution under the Failure-to-Obey Ordinances would chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity.

105. The Failure-to-Obey Ordinances do not provide notice to protesters as to when an officer may lawfully order a protester to cease her expressive activity on a street or sidewalk, which are traditional public forums.

106. The Failure-to-Obey Ordinances, by their plain language, reach a substantial amount of constitutionally protected conduct, such as freedom of speech and the freedom of assembly.

107. The Failure-to-Obey Ordinances violate the Free Speech Clause of the First Amendment to the Constitution, facially and as applied to persons engaged in expressive conduct, because they are substantially overbroad relative to Kansas City's legitimate interest in ensuring the free and orderly flow of traffic on streets and sidewalks.

108. The Failure-to-Obey Ordinances are neither narrowly tailored nor the least restrictive means to achieve any sufficiently strong government interest, and they do not leave open ample alternative avenues of communication for Plaintiffs to convey their constitutionally protected message.

109. Because Kansas City does not issue permits or maintain another process through which to legally protest on a street or sidewalk, the plain language of the Failure-to-Obey Ordinances completely forecloses a venerable means of communication—sidewalk and street protests—that is both unique and important.

110. Furthermore, the Kansas City Code § 50-44(a) is unconstitutionally overbroad because it criminalizes ordinary conduct, including a single person standing in a public place, or in front of a public or private building, without any intent requirement.

111. Specifically, a single person standing in a public place, or in front of a public or private building, could violate section 50-44(a) even though the person does not have any intent to "in any way or manner hinder, obstruct, molest, resist or otherwise interfere with any city public safety officer".

112. Because section 50-44(a) does not include an intent requirement, a violation of the ordinance turns on the subjective opinions of police officers who observe the conduct at issue.

113. The Failure-to-Obey Ordinances' restriction on First Amendment-protected expressive activity is much greater than necessary to further any legitimate interest it serves.

### COUNT II: FOURTEENTH AMENDMENT
*The Failure-to-Obey Ordinances Are Void-for-Vagueness in Violation of Due Process Clause*

114. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

115. The Due Process Clause provides the constitutional foundation for the void-for-vagueness doctrine.

CORE/3520307.0002/160173323.2

116. The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

117. An important aspect of the void-for-vagueness doctrine is the requirement that the legislature establish minimal guidelines to govern law enforcement. Otherwise, a criminal statute may permit a standard-less sweep that allows police officers to pursue their personal predilections.

118. The Failure-to-Obey Ordinances do not include any guidelines to govern law enforcement.

119. In particular, the Failure-to-Obey Ordinances confer virtually unrestrained authority upon the police.

120. Furthermore, section 50-44(a) does not include an intent requirement.

121. Indeed, a *single* person—regardless of the person's intent—violates the Failure-to-Obey Ordinances whenever the person "in any way or manner hinder[s], obstruct[s], molest[s], resist[s] or otherwise interfere[s] with any city public safety officer".

122. Section 70-73 is impermissibly vague as the phrase "fail or refuse to comply with any lawful order or direction" is unclear and arbitrary.

123. Conduct which may cause one police officer to issue an order for violation of the Failure to Obey Ordinances may be disregarded as innocuous by another police officer.

124. The Failure-to-Obey Ordinances lend themselves to arbitrary, discriminatory and harsh enforcement.

CORE/3520307.0002/160173323.2

125. The Failure-to-Obey Ordinances apply to groups of people of any size or even a single person, and they apply even where traffic is not actually using a street or sidewalk—even where the street or sidewalk has been closed by police.

126. The Failure-to-Obey Ordinances are violated daily, but are enforced only against certain individuals who are chosen through the unguided discretion of individual police officers.

127. For example, a parade commemorating Veterans Day, a group of people standing on a sidewalk waiting for a ride, an LGBTQ pride march, and a neighborhood "Block Party" all fall within the scope of the Failure-to-Obey Ordinances, but the City of Kansas City has not enforced the Failure-to-Obey Ordinances against people taking such actions.

128. The Failure-to-Obey Ordinances are not only susceptible to regular application to protected expression but have in fact been used regularly to cite persons engaged in constitutionally protected expression.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Court:

A. Grant a preliminary injunction upon motion and a permanent injunction preventing enforcement of the Failure-to-Obey Ordinances;

B. Enter a declaration that the Failure-to-Obey Ordinances are unconstitutional on their face and as applied to Plaintiffs;

C. Award Plaintiffs costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

D. Allow such other and further relief as this Court finds just and proper under the circumstances.

Respectfully submitted,

STINSON LLP

*/s/ John C. Aisenbrey*
John C. Aisenbrey, MO #31907
Bradley J. Yeretsky, MO #53845
Bryce Langford, MO #69188
Renee E. Henson, MO #71000
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Tel.: 816-842-8600 / 816-691-2360
Fax: 816-412-0997 / 816-691-3495
john.aisenbrey@stinson.com
brad.yeretsky@stinson.com
bryce.langford@stinson.com
renee.henson@stinson.com

and

Anthony E. Rothert, MO #44827
Jessie Steffan, MO # 64861
Omri E. Praiss, MO #41850
Kayla M. DeLoach, MO #72424
ACLU of Missouri Foundation
906 Olive Street, Ste. 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org
opraiss@aclu-mo.org
kdeloach@aclu-mo.org

and

Gillian R. Wilcox, MO #61278
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, Missouri 64111
Phone: 816/470-9938
Fax: 314/652-3112
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*