# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| **SARIAH MOODY,** ) | |
| **GRACE READING,** ) | |
| **And** ) | |
| **EMILY CADY,** ) | **Case No. 20-CV-526** |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CITY OF KANSAS CITY, MISSOURI,** ) | |
| ) | |
| **Defendant.** ) | |

## SUGGESTIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

John C. Aisenbrey, MO #31907
Bradley J. Yeretsky, MO #53845
Bryce Langford, MO #69188
Renee E. Henson, MO #71000
STINSON LLP
1201 Walnut Street
Kansas City, Missouri 64106
Tel.: 816-842-8600 / 816-691-2360
Fax: 816-412-0997 / 816-691-3495
john.aisenbrey@stinson.com
brad.yeretsky@stinson.com
bryce.langford@stinson.com
renee.henson@stinson.com

Anthony E. Rothert, MO #44827
Jessie Steffan, MO #64861
Omri E. Praiss, MO #41850
Kayla DeLoach, MO #72424
ACLU of Missouri Foundation
906 Olive Street, Ste. 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org
opraiss@aclu-mo.org
kdeloach@aclu-mo.org


Gillian R. Wilcox, MO #61278
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, Missouri 64111
Phone: 816/470-9938
Fax: 314/652-3112
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*

# Table of Contents

Page

I.   Introduction ................................................................................................................ 1

II.  Statement of Facts ....................................................................................................... 1

    A.   Sariah Moody's Unconstitutional Arrest .................................................... 1

    B.   Grace Reading's Unconstitutional Arrest ................................................... 3

    C.   Emily Cady's Unconstitutional Arrest ....................................................... 6

    D.   Summary of the Charges ............................................................................. 9

III. Argument ..................................................................................................................... 9

    A.   Preliminary Injunction Standard ................................................................ 9

    B.   First Amendment Implications ................................................................. 10

    C.   Plaintiffs are likely to succeed on the merits because the Failure-to-Obey Ordinances violate their Rights under the First and Fourteenth Amendments. ............................................................................................. 10

        1.   The Failure-to-Obey Ordinances are Void for Vagueness ........... 11

        2.   Section 70-73 is an Unconstitutional Restriction of the First Amendment ................................................................................... 13

        3.   Section 50-44(a) is Unconstitutionally Overbroad ...................... 15

    D.   Remaining *Dataphase* Factors Favor a Preliminary Injunction .............. 17

IV.  Conclusion ................................................................................................................. 17

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Phelps-Roper v. Ricketts*,
867 F.3d 883 (8th Cir. 2017) ............................................. 13

*Abdullah v. Cty. of St. Louis*,
52 F. Supp. 3d 936 (E.D. Mo. 2014) ..................................... 9

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ............................................ 10

*City of Chicago v. Morales*,
527 U.S. 41 (1999) (plurality opinion) ................................. 10

*City of Houston v. Hill*,
482 U.S. 451 (1987) ................................................. 14, 15, 16

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) (en banc) ............................... 9, 16

*Doe v. S. Iron R-1 Sch. Dist.*,
453 F. Supp. 2d 1093 (E.D. Mo. 2006), *aff'd*, 498 F.3d 878 (8th Cir. 2007) .......... 17

*Elrod v. Burns*,
427 U.S. 347 (1976) ..................................................... 16

*FCC v. Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012) .................................................. 10

*Fuller v. Norman*,
936 F. Supp. 2d 1096 (W.D. Mo. 2013) ................................ 17

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ................................................ 10, 11, 12

*Jones v. Jegley*,
947 F.3d 1100 (8th Cir. 2020) ............................................ 9

*Kolender v. Lawson*,
461 U.S. 352 (1983) ..................................................... 10

*Lane v. Lombardi*,
No. 2:12-CV- 4219-NKL, 2012 WL 5873577 (W.D. Mo. Nov. 15, 2012) .......... 16, 17

CORE/3520307.0002/160173325.2

*Langford v. St. Louis*,
No. 4:18CV2037 HEA, 2020 WL 1227347 (E.D. Mo. Mar. 5, 2020) .................11, 12, 13, 14

*Marcus v. Iowa Pub. Television*,
97 F.3d 1137 (8th Cir. 1996) ................................................................................16

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir. 2012) (en banc) ..........................................................9, 16

*New York v. Ferber*,
458 U.S. 747 (1982)...............................................................................................14

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)..................................................................................................13

*Phelps-Roper v. Cty. of St. Charles*,
780 F. Supp. 2d 898 (E.D. Mo. 2011)...................................................................16

*Phelps-Roper v. Koster*,
713 F.3d 942 (8th Cir. 2013) ..................................................................................9

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar*,
381 F.3d 785 (8th Cir. 2004) ................................................................................13

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969)................................................................................................13

*Stahl v. City of St. Louis*,
687 F.3d 1038 (8th Cir. 2012) ..............................................................................10

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) ..............................................................................14

*Video Software Dealers Ass'n v. Webster*,
968 F.2d 684 (8th Cir. 1992) ................................................................................15

**Statutes**

Kansas City Code §§ 50-44 and 70-73 .....................................................................1

Missouri statute § 565.082......................................................................................16

CORE/3520307.0002/160173325.2

## I.     Introduction

Plaintiffs seek a preliminary injunction to ensure that city ordinances are no longer unconstitutionally enforced against individuals engaging and participating in constitutionally protected protest activity.

Following the murder of George Floyd in Minneapolis, Minnesota, protests took place across the nation and throughout the world. These protests focused on bringing an end to police brutality and racial injustice in America. Kansas City is not an exception to the protests or the reasons they are taking place. Protests against police brutality and racial injustice in Kansas City are planned to occur through at least October 2020.

The City of Kansas City, Missouri police arrested over 200 non-violent protestors in May and June of 2020 for violating Kansas City Code §§ 50-44 and 70-73 (collectively the "Failure-to-Obey Ordinances"). The Failure-to-Obey Ordinances criminalize the impedance of traffic and the failure to obey an order of a police officer. The Failure-to-Obey Ordinances are unconstitutional facially and as applied because they give individual police officers unfettered discretion to engage in arbitrary and discriminatory enforcement and are overbroad and vague under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

## II.     Statement of Facts

### A.     Sariah Moody's Unconstitutional Arrest

On May 31, 2020, Sariah Moody was arrested while attending non-violent protests at the Plaza in Kansas City. Ex. 1, Moody Declaration. Ms. Moody was sitting just off the curb between a crowd of people in a closed street and the sidewalk. *Id.* ¶ 3. She was trying to keep her distance from the main crowd to avoid contracting the virus that causes COVID-19, given the

1

current global health crisis with the COVID-19 pandemic. *Id.* ¶ 4. There were approximately 2,000 protesters at the Plaza that day.[1]

For over two hours, Ms. Moody had been sitting, or kneeling, close to the curb on J.C. Nichols Parkway near to the crosswalk at Emanuel Cleaver II Boulevard. *Id* ¶ 6. Ms. Moody was blowing bubbles as part of her protest. *Id.* ¶ 7. J.C. Nichols Parkway was closed to vehicle traffic. *Id.* ¶ 8. During the afternoon, police officers had moved some protesters off of 47th Street, but said that Ms. Moody could remain in the street near the curb at J.C. Nichols Parkway. *Id.* ¶ 9. However, at a little after 5:00 PM, suddenly, Ms. Moody's daughter told her to "watch out." *Id.* ¶ 10.

Ms. Moody looked up, but because the sun was in her eyes, she could see only shadowy figures advancing toward her. *Id.* ¶ 11. Ms. Moody does not know whether the shadowy figures were police officers or SWAT officers, but they were shouting "move, move!" *Id.* ¶ 12. Ms. Moody heard no warning from the police nor was she told to move prior to being shouted at by the figures suddenly moving toward her. *Id.* ¶ 13.

Ms. Moody was still seated on the ground, when two officers picked her up, and she was then surrounded by six other officers. *Id.* ¶ 14. The officers asked her if she was going to move, and she said, "No." *Id.* ¶ 15. Ms. Moody did not move because that entire area – including J.C. Nichols Parkway and the location where she had been sitting – was shut down for the protest. *Id.* ¶ 16. The police had sectioned off that area for the protesters and she believed she was allowed to be there. *Id.* ¶ 17.

---

[1] KMBC 9 News Staff, *Kansas City police say 'unlawful protests' on Country Club Plaza 'wrapped up'*, KMBC News 9 ABC (June 1, 2020, 2:58 PM), https://www.kmbc.com/article/kansas-city-missouri-country-club-plaza-protest-live-update-kansas-city-police-westport/32723737 ("[Kansas City Police Department Capt. David Jackson said he] estimates the crowd to be about 2,000 protesters").

CORE/3520307.0002/160173325.2

Police were arresting other protesters, and many – including Ms. Moody – asked the reason for their arrests. *Id.* ¶ 18. The officers never responded. *Id.* ¶ 19. Ms. Moody had not moved from her location the entire time she was protesting, but she was one of the first to be arrested that afternoon. *Id.* ¶ 20. Ms. Moody's hands were zip-tied so tightly that they became numb. *Id.* ¶ 21. She did not recover full feeling back in her hands until the next day, and she missed work due to the injury. *Id.* ¶ 22.

After Ms. Moody's arrest, she was taken by the police to two different precincts and placed in a cell at both. *Id.* ¶ 23. Despite Ms. Moody's requests, the police officers refused to tell her what she was being charged with. *Id.* ¶ 24. It was not until after Ms. Moody spoke with a bail bondsman that she was told what the charges were. *Id.* ¶ 25. Ms. Moody was charged with a violation of section 70-73 for failure to comply with the police order. *Id.* ¶ 26. Her bond was set at $1,000. *Id.* ¶ 27. On her bond release document, an officer wrote that Ms. Moody was "not to return to Plaza." *Id.* ¶ 28. Ms. Moody believes strongly in the cause of the protests – raising awareness about police brutality and racial injustice – and these were the first protests she had ever attended. *Id.* ¶ 29. But, because of her arrest, charges, and treatment by police, she is now afraid to exercise her right to protest, and she does not believe she will participate in future protests unless she is accompanied by legal counsel. *Id.* ¶ 30.

### B.     Grace Reading's Unconstitutional Arrest

On June 2, 2020, Grace Reading attended non-violent protests in Kansas City. Ex. 3, Reading Declaration. Ms. Reading and friends arrived at the Plaza to distribute supplies, including water bottles, first aid supplies, goggles, wipes, rubbing alcohol, gauze, and masks. *Id.* ¶ 3. When they arrived at the Plaza around 5:30 PM, the protesters were west of the J.C. Nichols Fountain, lined up on J.C. Nichols Parkway, which was closed to traffic for the protest. *Id.* ¶ 4.

3

Ms. Reading estimates that as many as 50 or more police officers were standing on the sidewalk west side of J.C. Nichols Parkway, in front of the Rye Plaza restaurant, immediately north of P.F. Chang's. *Id.* ¶ 5. When Ms. Reading arrived, the police officers were grouped together while observing the protesters. *Id.* ¶ 6.

The protesters were on the east side of J.C. Nichols Parkway and (with limited exceptions) did not cross the double yellow lines in the middle of J.C. Nichols Parkway, which the protesters treated as an informal divider between themselves and the nearby police officers. *Id.* ¶ 7.

After Ms. Reading dispersed supplies, she returned to the protesters around the block. *Id.* ¶ 8. When she returned from the fountain area from the march, the police had changed their position. *Id.* ¶ 9. Instead of just observing, the approximately 50 officers were now lined up in rows in front of Rye on J.C. Nichols Parkway and appeared ready to take immediate action against the protesters. *Id.* ¶ 10. Throughout the day, the police would line up, push the protesters back, and then retreat back to a group. *Id.* ¶ 11. Ms. Reading was standing with other protesters at the yellow painted traffic line on the closed (to traffic) J.C. Nichols Parkway, a location the police officers had previously allowed protesters to remain. *Id.* ¶ 12.

Without warning, the police officers began to order the protesters to "step back" from the yellow painted traffic line. *Id.* ¶ 13. An African-American protester standing next to Ms. Reading encouraged Ms. Reading not to step back. *Id.* ¶ 14. Ms. Reading decided to stand with this and other protesters, and refused to move out of the (closed) street. *Id.* ¶ 15. As the police approached, Ms. Reading locked arms with her friend. *Id.* ¶ 16. The advancing police officers arrested Ms. Reading and her friend. *Id.* ¶ 17.

Once arrested, she was taken to the curb at the Cheesecake Factory on the southwest corner of 47th Street and J.C. Nichols Parkway. *Id.* ¶ 18. Ms. Reading asked what she was being charged with, but the police officers would not tell her anything. *Id.* ¶ 19. She was not given *Miranda* warnings, and the bandana she was wearing as a mask and her bag were seized and searched. *Id.* ¶ 20. While she did not have her mask, the police required her to remain within six feet of other officers, and she was unable to safely social distance herself from them which caused her concern due to the COVID-19 pandemic and the known community spread of the virus that causes COVID-19. *Id.* ¶ 21. After her arrest, Ms. Reading was driven around by the police for approximately 30 minutes before she was taken to a parking lot and then to a precinct, where she was booked. *Id.* ¶ 22. Ms. Reading's bags were taken out of sight and searched again while at the parking lot. *Id.* ¶ 23. It felt more like a kidnapping to Ms. Reading than an arrest. *Id.* ¶ 24.

At the precinct, Ms. Reading saw officers using excessive force on other arrested protesters. *Id.* ¶ 25. One police officer tackled a African-American female protester, slammed her into the concrete ground, and placed his knee on the same protester's neck. *Id.* ¶ 26. Ms. Reading saw a group of officers, but an officer named Skinner was definitely leading their actions. *Id.* ¶ 27. Skinner had his knee on her neck, but he eventually moved it after the detainees yelled, "Get your knee off her neck." *Id.* ¶ 28. Skinner moved his knee to between her shoulder blades and then looked back and taunted the detainees while continuing to exercise excessive force. *Id.* ¶ 29. Another officer placed his hand on the back of her head and shoved it into the concrete floor. *Id.* ¶ 30. Ms. Reading believes there were at least two other officers who were also holding her down. *Id.* ¶ 31. A female officer stood over them and observed. *Id.* ¶ 32. The same protester was later taken away by ambulance. *Id.* ¶ 33. Ms. Reading was released on a $500 bond after

approximately five hours in custody. *Id.* ¶ 34. Ms. Reading was charged with a violation of section 50-44(a). *Id.* ¶ 35.

Ms. Reading has attended several non-violent protests in the past, including at least three other non-violent protests in Kansas City where she was not arrested nor did she witness any arrests. *Id.* ¶ 36. Those protests focused on issues such as abortion rights, humane treatment of immigrants, and the #MeToo movement. *Id.* ¶ 37. However, the police presence and actions at the protests in May and June against police brutality and racial injustice were markedly different from the protests Ms. Reading has attended in the past. *Id.* ¶ 38. Because of her arrest and the treatment she received by the police during the non-violent protests on June 2, 2020, Ms. Reading feels anxious at the thought of attending another protest in Kansas City and has not attended one since her arrest, despite being asked by friends to join them at subsequent protests. *Id.* ¶ 39. She experiences a new wave of anxiety now when a police car passes her while she is driving. *Id.* ¶ 40. Until she feels safe returning to in-person protests of police brutality and racial injustice, Ms. Reading has shifted her focus to letter writing and email campaigns. *Id.* ¶ 41. The treatment she received by the police on June 2, 2020, was dehumanizing and disorienting. *Id.* ¶ 42. Watching the officer assault an African-American protester right in front of her and their actions taunting her and others while they sat in a jail cell are experiences that will replay in her mind for the rest of her life. *Id.* ¶ 43. Ms. Reading believes that protests will continue until Kansas City begins to act in the interest of its residents, which may take months or even longer. *Id.* ¶ 44.

### C.    Emily Cady's Unconstitutional Arrest

On June 1, 2020, Plaintiff Emily Cady attended non-violent protests at the Plaza in Kansas City. Ex. 2, Cady Declaration. Around 5:30 PM, Ms. Cady and a friend joined a group of non-violent protesters who were marching along Main Street heading north toward downtown.

*Id.* ¶ 3. The group was led by a minister who stopped at times to kneel and encouraged the group to continue to protest non-violently. *Id.* ¶ 4. Police officers remained along the sides of the group as they marched north on Main Street, and at many of the side streets, four to five officers blockaded movement east or west. *Id.* ¶ 5.

Eventually the group reached 31st and Main. *Id.* ¶ 6. Here, the police had blocked further movement to the north. *Id.* ¶ 7. The group collectively decided to continue to move toward downtown Kansas City. *Id.* ¶ 8. To avoid the blockade at 31st and Main, the group backed up to the south on Main and then headed west on Linwood Boulevard toward Broadway. *Id.* ¶ 9. When the group reached Broadway, they turned north again. *Id.* ¶ 10.

At 31st and Broadway, Ms. Cady and the group observed another police blockade formed by approximately 70 police officers and their vehicles stopping movement north. *Id.* ¶ 11. The protesters stopped a full block before they reached the police barricade. *Id.* ¶ 12. Around 7:30 PM, Ms. Cady observed police officers putting on riot gear. *Id.* ¶ 13. Some of the protesters returned to the Plaza, but many, including Ms. Cady, remained and knelt down. *Id.* ¶ 14.

As protesters were kneeling, one officer commanded the police in riot gear to "commence forward march," and the officers began advancing toward the protesters in a line while hitting their batons on their shields. *Id.* ¶ 15. A police officer on a megaphone told the protesters that it was an unlawful gathering and ordered the protesters to return south. *Id.* ¶ 16. The officer on the megaphone told the protesters that they could not have access to the highway (presumably the continuation of Broadway to the ramp onto Interstate 35). *Id.* ¶ 17. Multiple protesters responded that they did not intend to go to the highway but only wanted to move forward (north on Broadway). *Id.* ¶ 18.

7

The police officers continued to advance toward the protesters, and the remaining protesters, including Ms. Cady, moved toward the Plaza, now heading south along Pennsylvania Avenue. *Id.* ¶ 19. The police set up another blockade at or around 39th Street and Pennsylvania, blocking the remaining protesters from moving further south, which the police hay had just ordered them to do. *Id.* ¶ 20. The group crossed 39th street, stepped onto the south sidewalk, and headed east on 39th Street toward Washington Street. *Id.* ¶ 21.

Before they reached Washington Street, Ms. Cady and the other protesters were on the sidewalk when they were suddenly surrounded by shouting police officers. Police officers ordered all the protesters to get on the ground. *Id.* ¶ 22. Ms. Cady initially said "no," and one officer screamed at Ms. Cady to "get on the fucking ground." *Id.* ¶ 23. Some of the protesters asked why they were under arrest but did not receive specific answers. *Id.* ¶ 24. Ms. Cady heard the police officers say to each other "What's the arrest?" and "What are we noting?" *Id.* ¶ 25. Ms. Cady's backpack was searched without her consent. *Id.* ¶ 26. She was then put in a vehicle with four other protesters and taken to a parking lot where she and the others were booked into custody. *Id.* ¶ 27.

Ms. Cady was released on a $1,000 bail at approximately 5:00 AM on June 2, 2020. *Id.* ¶ 28. She was charged with a violation of section 70-73 for failing to comply with the lawful order of a police officer. *Id.* ¶ 29. When she was signing the bail paperwork, a police officer said to Ms. Cady, "If you get arrested for the same offense, you won't be eligible for bail." *Id.* ¶ 30.

Ms. Cady has attended other non-violent protests in the past, including the Women's March, a non-violent protest in Kansas City where she was not arrested and did not witness any arrests. *Id.* ¶ 31. However, because of her arrest and the treatment she received by the police during the non-violent protests on June 1, 2020, Ms. Cady is afraid to return to protests in the

CORE/3520307.0002/160173325.2

future. *Id.* ¶ 32. She is afraid of being arrested, tear gassed, hit with a baton, or injured by police while participating in non-violent protests. *Id.* ¶ 33. She is especially concerned about being arrested and held without bail or being detained for a long period of time. *Id.* ¶ 34.

### D. Summary of the Charges

Plaintiffs Moody and Cady were both charged with violating section 70-73, which states:

> No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer, parking control officer, firefighter or uniformed adult school crossing guard with authority to direct, control or regulate traffic.

Plaintiff Reading was charged for violating section 50-44(a), which states:

> Any person who shall in any way or manner hinder, obstruct, molest, resist or otherwise interfere with any city public safety officer, employee or inspector, including, but not limited to, any firefighter or other fire suppression employee, fire prevention inspector, health inspector, building code inspector, zoning inspector, property maintenance or nuisances code inspector, illegal dumping inspector, regulated industries investigator or animal control officer, any employee or official of the metropolitan ambulance services trust or the ambulance contractor providing ambulance service for the metropolitan ambulance services trust, or any officer of the city police department or any member of any other law enforcement agency or police force, in the discharge of his/her official duties shall be guilty of an ordinance violation.

The enforcement of the Failure-to-Obey Ordinances has frightened Plaintiffs and chilled their participation in future protesting activity. They were unconstitutionally arrested with crimes for participating in protected activities.

### III. <u>Argument</u>

### A. Preliminary Injunction Standard

When considering whether to issue a preliminary injunction, this Court must determine: (a) whether the plaintiffs are likely to prevail on the merits, (b) if there exists a threat of irreparable harm to the plaintiffs absent the injunction, (c) the balance between this harm and the injury that the injunction's issuance would inflict upon the defendant, and (d) what is in the

public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc*); accord Abdullah v. Cty. of St. Louis*, 52 F. Supp. 3d 936, 943 (E.D. Mo. 2014).

### B. First Amendment Implications

When the government regulates the exercise of First Amendment rights, the burden is on the proponent of the restriction to establish its constitutionality. *Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013). Moreover, where a challenged policy restricts First Amendment activity, consideration of the likelihood of success on the merits is decisive to the question of whether an injunction should issue. In a First Amendment case, the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue. *See Jones v. Jegley*, 947 F.3d 1100, 1105 (8th Cir. 2020) ("likely to succeed on the merits [is] generally the most important factor in First Amendment cases") (citation omitted). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (quoting *Phelps–Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam) (quotation marks omitted)).

In addition to Plaintiffs' First Amendment claims, their due process claims should be considered under this framework because, in the context of this case they touch upon First Amendment rights.

### C. Plaintiffs are likely to succeed on the merits because the Failure-to-Obey Ordinances violate their Rights under the First and Fourteenth Amendments.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A policy, custom, or law is unconstitutionally vague

10

where it "does not provide people with fair notice of when their actions are likely to become unlawful," *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012), and when it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (brackets and quotation marks omitted); *see also City of Chicago v. Morales,* 527 U.S. 41, 56 (1999) (plurality opinion).

### 1. The Failure-to-Obey Ordinances are Void for Vagueness

The Failure-to-Obey Ordinances are void for vagueness under the Fourteenth Amendment and violate due process because they invite discriminatory and arbitrary enforcement by law enforcement officers. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "In those instances when an imprecise law implicates speech and assembly rights, an injured plaintiff may also facially challenge a statute as void for vagueness." *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012). If the statute allows law enforcement to arrest and prosecute on an "ad hoc and subjective basis," then it encourages arbitrary and discriminatory enforcement. *Grayned,* 408 U.S. at 109. "An ordinance that grants police … 'discretion ... to determine' whether a violation has occurred 'entrusts lawmaking to the moment-to-moment judgment of the policeman ... furnishes a convenient tool for harsh and discriminatory enforcement, ... and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Langford v. St. Louis*, No. 4:18CV2037 HEA, 2020 WL 1227347, at *21 (E.D. Mo. Mar. 5, 2020).

In *Langford v. St. Louis*, a protester was arrested after failing to obey a police officer's order to step onto the sidewalk pursuant to an ordinance that allowed law enforcement officers to

arrest individuals impeding traffic, though there was no traffic at the time of her arrest. *Id.* at *2.[2] The ordinance read, "No person, or persons congregating with another or others, shall stand or otherwise position himself or herself in any public place in such a manner as to obstruct, *impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic*." *Id.* at *4 (emphasis added). It was challenged on the fact that there was no traffic when the plaintiff was arrested, it allows discretion to police officers to arrest individuals in almost any circumstance, and there was no exclusion for expressions of protected speech, such as protests. *Id.* The court held that this ordinance invited an undue risk of arbitrary and discriminatory enforcement, was therefore void for vagueness, and was unconstitutional as applied to the plaintiff because there was no traffic at the time of arrest. *Id.* at *21.

Here, plaintiff Moody attended a protest in Kansas City advocating against police brutality, racial injustice, and corrupt actions by police departments all over the country and was arrested pursuant to section 70-73, which states "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer, parking control officer, firefighter or uniformed adult school crossing guard with authority to direct, control or regulate traffic." At the time of her arrest, Ms. Moody was on J.C. Nichols Parkway, which was closed for the protest. There were no vehicles allowed in or around her location. Ms. Cady had been protesting in the streets, but she was arrested on the 39th Street sidewalk after she refused an order to "get on the f#*king ground." As in *Langford*, Ms. Moody and Ms. Cady were arrested for a traffic infraction when there was, in fact, no traffic. Section 70-73 is extraordinarily vague. It does not even require the officer's order to relate to traffic – which the order to Ms. Cady walking on a sidewalk clearly did not – as long as the officer is empowered to "control or

---

[2] She was also arrested, pursuant to another section of the ordinance, for failing to obey the police officer's command. *Id.*

regulate traffic." Section 70-73 is even more vague than the one at issue in *Langford*. Here, officers can arrest individuals anytime they feel their direction has not been heeded.

Similarly, section 50-44(a) is unconstitutionally vague in that it allows officers to enforce the ordinance whenever they feel that a person exercising their First Amendment rights at a non-violent protest "hinder[s], obstruct[s], molest[s], resist[s] or otherwise interfere[s]" with an officer. Like Ms. Moody, Ms. Reading was participating in a non-violent protest on J.C. Nichols Parkway, which was closed to traffic at the time she was arrested, because she refused the officer's order to "step back." Ms. Reading had participated in other non-violent protests in Kansas City – concerning abortion rights, humane treatment of immigrants, and the #MeToo movement without incident – yet she was arrested and handled in a way that seemed to her like a kidnapping when she protested police brutality and racial injustice. These ordinances are invoked, or not, at the unfettered discretion of the police.

The Failure-to-Obey Ordinances thus fail because they allow for virtually unlimited police discretion when it comes to enforcement. *See Grayned,* 408 U.S. at 109. Ordinances such as this could criminalize almost any form of protest activity and pose significant issues when applied to people exercising their First Amendment rights. Kansas City's interest in regulating traffic, road safety, and protecting officers is not sufficient to enable police to arrest anyone who does not comply with their direction, even when there is no traffic or road safety issues present. Thus, these ordinances invite arbitrary and discriminatory enforcement, particularly against protesters speaking out against police brutality, and therefore are void for vagueness under the Fourteenth Amendment and violate due process.

> **2.** **Section 70-73 is an Unconstitutional Restriction of the First Amendment**

CORE/3520307.0002/160173325.2

The arrests under section 70-73 are unconstitutional as applied to the protesters. The First Amendment protects protests, marches, parades, and pickets as methods of expression of free speech. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969). When the government tries to limit this expression, the government's "rights … to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). An as-applied challenge consists of a challenge to the statute's application only to the party before the court. *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004). The plaintiff must prove "that the [Ordinance] is unconstitutional 'because of the way it was applied to the particular facts of [the] case.'" *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017).

In *Langford*, the court held that the statute at issue was unconstitutional as applied to the plaintiff because the statute was intended to promote traffic safety, and yet was utilized against the defendant when there was no traffic. *Langford*, 2020 WL 1227347, at *21. The defendant argued that they were trying to reopen the streets, and that is why the plaintiff was impeding traffic. *Id.* The court held that the plaintiff's arrest was obviously intended to chill her speech, as she was arrested when engaging in protest – a form of protected First Amendment speech. *Id.*

Here, protesters were arrested for engaging in protect First Amendment speech either on closed streets or on a sidewalk after moving from streets that were either closed or where there was no traffic present. They cannot have been lawfully arrested for a traffic violation when there was no traffic, or even any prospect of traffic, as in *Langford*. The arrests were intended to chill or circumscribe Plaintiffs' First Amendment-protected speech. This renders the ordinance and the protesters' subsequent arrests unconstitutional as applied to the protesters.

### 3. Section 50-44(a) is Unconstitutionally Overbroad

Section 50-44(a) is unconstitutionally overbroad under the First Amendment. A statute that is substantially overly broad may be invalidated on its face. *New York v. Ferber*, 458 U.S. 747, 769 (1982). Overbreadth "invalidate[s] a statute when it 'infringe[s] on expression to a degree greater than justified by the legitimate governmental need' which is the valid purpose of the statute." *United States v. Morison*, 844 F.2d 1057, 1070 (4th Cir. 1988). A statute can be unconstitutionally overbroad even if there are potentially legitimate applications of that statute. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). Criminal statutes require even closer scrutiny. *Id.*

For example, in *City of Houston v. Hill*, the Court ruled a municipal ordinance that made it a crime "for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest" was unconstitutionally overbroad. *Id.* at 455. The Court pointed out that this ordinance left an extreme amount of discretion for the police. *Id.* at 462. Almost any communication with a police officer that annoyed or offended them could be a violation of this ordinance. *Id.* The claimed government interest – protecting the safety of police officers – was already addressed by state statutes criminalizing the assault of a law enforcement officer. *Id.* at 460-61. Thus, the statute was unconstitutionally overbroad and did encroached on First Amendment rights without a justified government interest. *Id.* at 462.

Here, section 50-44(a) makes it an offense to "in any way or manner hinder, obstruct, molest, resist or otherwise interfere with" a police officer in the discharge of her or his official duties. No intent to hinder or otherwise interfere is required. Protesters in Kansas City, including Plaintiff Reading, were arrested and charged with violating 50-44(a), and no other ordinance, while engaging in non-violent protected speech. Section 50-44(a) reaches and

15

infringes upon protected expression under the First Amendment, as seen here. It reaches a substantial amount of this protected interest, as protesters were arrested while engaging in non-violent, protected speech. This Ordinance is nearly identical to the municipal ordinance ruled in *Hill* as unconstitutional.[3]

Almost any constitutionally protected communication with any one of the officers identified in the ordinance could lead to a citation and arrest. One does not even need to intend to interfere. Asking a state trooper why one was pulled over, not answering a police officer asking a question, or, as seen here, engaging in non-violent protest activity against police brutality could all lead to a citation under this ordinance. Additionally, section 50-44(a) is a criminal ordinance without a knowledge or intent requirement. Because it chills speech, the ordinance must have a knowledge requirement. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("[W]e believe any statute that chills the exercise of First Amendment rights must contain a knowledge element").

Presumably, as in *Hill*, the cited government interest in this ordinance is assuring the safety of law enforcement and other officials. But that interest is already addressed in Missouri statute § 565.082, criminalizing assault against all public safety officials. Mo. Ann. Stat. § 565.082 (2013). There is simply no justifiable government interest in section 50-44(a). Enabling the police wide discretion to chill the speech of protesters is not a legitimate government interest. The substantial encroachment on First Amendment rights is unquestionably not satisfied by any sizable government interest. Thus, section 50-44(a) is unconstitutionally overbroad on its face.

---

[3] However, Section 50-44(a) is even broader, allowing for anyone who may say or do something to annoy a police officer to be in violation, but also anyone who may say or do something to annoy any "public safety" officer, employee, or inspector, to be in violation of this ordinance.

CORE/3520307.0002/160173325.2

For these reasons, Plaintiffs are likely to prevail on the merits.

### D. Remaining *Dataphase* Factors Favor a Preliminary Injunction

When a plaintiff has shown a likely violation of constitutional rights, the other requirements for a preliminary injunction are generally deemed to have been satisfied. *Swanson*, 692 F.3d at 870; *accord Phelps-Roper v. Cty. of St. Charles*, 780 F. Supp. 2d 898, 900-01 (E.D. Mo. 2011). There is no basis for departing from the general rule here.

A restriction of constitutional rights constitutes irreparable harm. It is clear that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *accord Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996). The alleged deprivation of liberty without due process constitutes irreparable harm. *See Lane v. Lombardi*, No. 2:12-CV- 4219-NKL, 2012 WL 5873577, at *6 (W.D. Mo. Nov. 15, 2012). Here, protests are ongoing and will be for the foreseeable future (Ex. 2 ¶ 44) so the need to participate in protected non-violent protest activity without being subject to arbitrary mistreatment is urgent and irreparable harm will occur if a preliminary injunction is not issued.

The balance of equities generally favors the constitutionally protected rights. *see Lane*, 2012 WL 5873577, at *6. "[I]t is always in the public interest to protect constitutional rights." *Fuller v. Norman*, 936 F. Supp. 2d 1096, 1098 (W.D. Mo. 2013) (citation omitted); *see also Doe v. S. Iron R-1 Sch. Dist.*, 453 F. Supp. 2d 1093, 1103 (E.D. Mo. 2006), *aff'd*, 498 F.3d 878 (8th Cir. 2007). The public interest is served by protection of the right to gather on public streets and sidewalks—traditional public forums—without arbitrary interference by law enforcement.

### IV. <u>Conclusion</u>

CORE/3520307.0002/160173325.2

For these reasons and those that will be presented at the hearing, Plaintiffs request this Court issue a preliminary injunction enjoining the enforcement of the Failure-to-Obey Ordinances and declaring them unconstitutional.

CORE/3520307.0002/160173325.2

Respectfully submitted,

STINSON LLP


*/s/ John C. Aisenbrey*
John C. Aisenbrey, MO #31907
Bradley J. Yeretsky, MO #53845
Bryce Langford, MO #69188
Renee E. Henson, MO #71000
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Tel.: 816-842-8600 / 816-691-2360
Fax: 816-412-0997 / 816-691-3495
john.aisenbrey@stinson.com
brad.yeretsky@stinson.com
bryce.langford@stinson.com
renee.henson@stinson.com

and

Anthony E. Rothert, MO #44827
Jessie Steffan, MO # 64861
Omri E. Praiss, MO #41850
Kayla DeLoach, MO#72424
ACLU of Missouri Foundation
906 Olive Street, Ste. 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org
opraiss@aclu-mo.org
kdeloach@aclu-mo.org

and

Gillian R. Wilcox, MO #61278
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, Missouri 64111
Phone: 816/470-9938
Fax: 314/652-3112
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*

19

## CERTIFICATE OF SERVICE

      I hereby certify that on June 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record. A copy of the foregoing was also hand-delivered to the office of the City Attorney for the City of Kansas City, Missouri.

_/s/ John C. Aisenbrey_
Attorney for Plaintiffs

CORE/3520307.0002/160173325.2